# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **FLEX HOMES, INC.** *et al.*, | : | **Case No.: 07cv1005** |
| | : | |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| | : | |
| **RITZ-CRAFT CORP OF** | : | <u>**OPINION AND ORDER**</u> |
| **MICHIGAN, INC.,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

Before the Court is a partial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (Doc. 6), filed by Defendants Ritz-Craft Corp. of Michigan, Inc. and Ritz-Craft Corp. of Pennsylvania, Inc. (collectively, "Ritz-Craft").  (Doc. 51, "Partial MSJ.")  The Plaintiffs, Flex Homes, Inc. ("Flex Homes"), and Kenneth and Ingrid Green (collectively, "the Greens"), have filed a brief in opposition (Doc. 55), and Ritz-Craft has filed a brief in reply (Doc. 58).  Accordingly, this matter is ripe for adjudication.  For the reasons articulated below, Ritz-Craft's partial motion for summary judgment is <u>**GRANTED in part**</u> **and** <u>**DENIED in part**</u>.

## I.     BACKGROUND

This is a dispute concerning the design, manufacture, delivery, and assembly of pre-fabricated homes. Although certain disputed facts will be discussed below, the following facts are undisputed.

### A.     UNDISPUTED FACTS

#### 1.     The Parties

Flex Homes is an Ohio corporation.  It is a family business in the residential construction field.  In short, Flex Homes is a builder.  Non-party Inga Dollinger ("Dollinger") is the owner and

President of Flex Homes.  (Dollinger Dep. 9, 23, Doc. 48.)  Plaintiff Ingrid Green is Dollinger's

daughter.  In 2004, Ingrid Green was the Sales Manager, General Contractor, and Vice President of

Flex Homes.[1]  (I. Green Dep. 8, Doc. 50.)  Plaintiff Kenneth Green is Ingrid Green's husband.  (K.

Green Dep. 5, Doc. 47.)  Kenneth Green has never been an employee of Flex Homes.  (*Id*. 26-27;

Dollinger Dep. 28.)  The Greens currently live in the house at the center of this lawsuit, 18715

Auburn Glen Drive in Chagrin Falls, Ohio.  (*Id*. 4.)  They moved there in the summer of 2005,

approximately eleven months after the home was purchased from Ritz-Craft in October of 2004.  (I.

Green Dep. 242.)

Ritz-Craft Corp. of Michigan, Inc. is a Michigan corporation; Ritz-Craft Corp. of

Pennsylvania, Inc. is a Pennsylvania corporation.   Both Ritz-Craft entities (collectively, "Ritz-

Craft"), are in the business of designing, manufacturing, selling, and delivering pre-fabricated homes.

Ritz-Craft's business model is to design, manufacture, and partially assemble the components of a

home at their factories in Michigan and Pennsylvania.  When customers – usually builders like Flex

Homes – order a pre-fabricated home, Ritz-Craft ships the customer the component parts of the

home, to be assembled on the site designated by the customer.  The customer is thus responsible for

preparing the building site.  As described by Ingrid Green:

> Flex Homes [*i.e.*, the builder] . . . improves the lot, . . . which means it puts the wells
> in, the septics or connects the sewers and water lines, depending on where the lot is
> located, clears the property, installs the driveway, puts the foundation in, installs the
> attached garage, finishes all the interior work, the electric work, the HVAC work,
> [and] plumbing.

(I. Green Dep. at 30-31.)  It is undisputed that Ritz-Craft is not responsible for any of these tasks

relating to site preparation.

---

[1] Ingrid Green left Flex Homes in 2007.  (I. Green Dep. 8.)

2

A "set crew" "sets" the pre-fabricated home on the foundation, assembling the component parts of the home based on the design and instructions provided by Ritz-Craft.  Set crews are approved by Ritz-Craft, although Michael McKeon of Ritz-Craft testified at his deposition that Ritz-Craft would approve almost any set crew the builder selected, so long as the set crew had the builder's confidence and proper Workers' Compensation and liability insurance.[2]  (M. McKeon Dep. 29-31, Doc. 49.)  In this case, the set crew was Defendant/Cross-Defendant Citadel Builders, Inc ("Citadel").[3]  (*Id.*)

In addition to the set crew, the builder hires sub-contractors in various trades to complete the installation process of the Ritz-Craft pre-fabricated home.  B&L Electric Co. ("B&L Electric") is one of the sub-contractors with whom Flex Homes contracted.  B&L Electric is an Ohio corporation based in Chagrin Falls, and it installed the electrical system in the Ritz-Craft pre-fabricated home at 18715 Auburn Glen Drive.  B&L Electric is a Defendant and a Third-Party Defendant to Ritz-Craft's Third-Party Complaint (Doc. 42).[4]

---

[2]  The parties dispute whether Flex Homes or Ritz-Craft selected Citadel as the set crew. (M. McKeon Dep. 29-31; I. Green Dep. 65.)

[3]  Citadel has not entered an appearance in this lawsuit, and the other parties have represented to the Court that they believe Citadel is no longer in business.  Neither Flex Homes nor Ritz-Craft have filed a motion for entry of default against Citadel.  Accordingly, the Court hereby **ORDERS** Flex Homes and Ritz-Craft to **SHOW CAUSE** within ten (10) days of the date of this Order why their claims against Citadel should not be dismissed for failure to prosecute.

[4]  Ritz-Craft has filed a Third Party Complaint asserting a cross-claim against B&L Electric for indemnification of any liability to the Plaintiffs for damages relating to the installation of the electrical system in the home at issue.  (Third Party Compl., Doc. 42.)  B&L Electric has not entered an appearance in this lawsuit, and Ritz-Craft has not filed a motion for entry of default.  Accordingly, the Court hereby **ORDERS** Ritz-Craft to **SHOW CAUSE** within ten (10) days of the date of this Order why their claims against B&L Electric should not be dismissed for failure to prosecute.

### 2.    Events Giving Rise to this Lawsuit

At the outset, it is important to reiterate that Flex Homes is a family business owned by Inga Dollinger and operated by Dollinger and her daughter, Ingrid Green.  This is particularly noteworthy because it adds an overlay of complexity to the business relationships and transactions between Flex Homes, the Greens, and Ritz-Craft.

### a.    The Contract Between Flex Homes and the Greens for the Greens to Purchase a Model Home for Flex Homes' Business Purposes

In 2004, Flex Homes decided to build a model home to market their services as a builder to potential customers.  (I. Green Dep. 59; K. Green Dep. 18-19.)  Pursuant to this goal, the family – Inga Dollinger and the Greens – agreed that the Greens would personally finance the construction of the model home for Flex Homes.  (*Id*.)  They believed that this was the best approach given their understanding of Ohio law relating to loans to corporations.  (*Id*.)  On August 13, 2004, the Greens signed a purchase agreement with Flex Homes, agreeing to obtain a loan to purchase a home for Flex Homes to use as a model home.[5]  As Ingrid Green explained at her deposition:

> We intended to purchase a home for Flex Homes to make a model home to sell after we sell out of – it's not – lending in Ohio is not the easiest thing to do, okay?  We had the funding, we had the ability, it's a family business . . . our intention when we signed at 8-13 was to build a home that we would not be living in, for profit purposes only.
>
> Q.  So in other words, correct me if I'm wrong, were you and your husband intending to buy a home for Flex Homes, Incorporated?
>
> A.  We were intending to get the mortgage so that we could have a home for Flex Homes.

---

[5]  Although the parties' briefs discuss the purchase agreement between Flex Homes and the Greens, and it is referenced as an exhibit to some of the depositions in this case, the parties have not provided the Court with a copy of this contract.

4

(I. Green Dep. 60-61; *see also id*. 66.)    The family had an understanding that they would rotate

responsibility for personally financing Flex Homes' construction of homes for re-sale.  (K. Green

Dep. 19.)

> **b.      The Builder Agreement Between Flex Homes and Ritz-Craft to Purchase Pre-Fabricated Homes from Ritz-Craft for Flex Homes' Business Purposes**

Having done business with Ritz-Craft before,[6] Flex Homes contracted with Ritz-Craft to

purchase the components of pre-fabricated houses from Ritz-Craft on or about October 25, 2004 --

after the Greens had obtained financing in August of 2004.  (Builder Agreement, Doc. 1-1.)  It is

undisputed, however, that the Greens are the title owner of the home at issue, not Flex Homes.  In

addition, the Greens made payments on the home to Flex Homes (not Ritz-Craft) pursuant to the

August 13 contract between the Greens and Flex Homes.  (I. Green Dep. 25-28.)  There is no

evidence that the Greens have a written contract with Ritz-Craft.  Nevertheless, Flex Homes' and

the Greens' intentions with respect to their business relationship with Ritz-Craft were clear;[7] they

intended to purchase pre-fabricated homes from Ritz-Craft, assemble or "set" them, and then re-sell

them to consumers for profit.  (I. Green Dep. at 60-61.)

The Builder Agreement between Flex Homes and Ritz-Craft states generally that "the parties

desire to establish a business relationship whereby the Builder (*i.e.*, Flex Homes) purchases Ritz-

Craft's products for resale to various customers of the Builder, subject to the terms and conditions

---

[6] In the 1990s, Flex Homes purchased several pre-fabricated homes from Ritz-Craft.  (I. Green Dep. 36.)

[7] It is <u>not</u> clear whether <u>Ritz-Craft</u> was aware of the Greens' and Flex Homes business plan or any financial arrangements between Flex Homes and the Greens regarding Ritz-Craft. What is clear is that the Greens and Inga Dollinger were all on the same page.

of this AGREEMENT." (Builder Agreement 1.) It further provides that Flex Homes is an independent contractor, as opposed to an agent or employee of Ritz-Craft; that Flex Homes will indemnify Ritz-Craft for violations of the agreement that generate claims by third-parties; and that the law of Pennsylvania governs the contract. It also disclaims all warranties other than the express limited warranty attached to the agreement. (Builder Agreement.)

### c.    The Model Home from Ritz-Craft

In or around February of 2005, Ritz-Craft delivered the first of the pre-fabricated homes governed by the Builder Agreement between Flex Homes and Ritz-Craft, *i.e.*, the home now at 18715 Auburn Glen Drive (hereinafter, "the Model Home"). The Model Home was one of its "Legacy" series homes, and was known as the "Madison" model. (Bindus Dep. 11.) At his deposition, Brook Bindus, Operations Manager of Ritz-Craft in Michigan, explained the significance of the series and model as follows:

> Each model is drafted independently according to the customer's options. So . . . I'm interested in building modules not models, . . . and from a production standpoint we build boxes that turn into houses. I really don't associate with the model itself.
>
> Q. Okay. So as I understand what you're saying, the model of a home would indicate let's call them a standard set of options that come with that home; is that correct? But there might be other homes that have that same box configuration but aren't that model?
>
> A. The model is really a marketing scheme that says what type of things are going into the home. As far as from a production standpoint, the basis of the home, the design is the same as every other home we build just in a different configuration. We build in a systems approved environment and they're building the same system over and over again in different configurations.
>
> Q. Okay. So I understand what you're saying about the boxes in different configurations. But as you change the configurations, you also have to change certain other things like vents and things like that; correct?

6

A.  Sure.
. . .
Q. . . . [I]s the Madison model a subsection of a larger group of . . .  type of homes?

A.  I think what you are referring to is the Legacy series homes.
. . . And that again . . . is a marketing series that we offer . . . .
. . . [I]t's one of I don't know how many floor plans . . . involved in the Legacy Homes.

(*Id*. 10-11.)

In addition, Bindus explained at his deposition that the State of Ohio inspects and approves Ritz-Craft's designs and products at the systems level – *i.e.*, the State requires Ritz-Craft to hire a state-approved independent inspector to inspect a home as designed and constructed in the Ritz-Craft factory, not on the ground after it is set.  (*Id*. 17-19.)  In addition, Mike McKeon explained the inspection process as follows:

Q. . . . . At what point would the state of Ohio have inspected [the Model Home]?  Is that done in the plant?

A.  Yeah.  The whole process is as we manufacture that house, we have inspectors and then the state of Ohio would hire a third party inspector to be in there really at every station to inspect that house and make sure its – that it meets code.

Q.  While it's being constructed.

A.  While it's being constructed.

Q.  So this is at the Michigan plant?

A.  Correct.  And then they put their stamp of approval on it.  And the state seals it and otherwise we can't ship it.  We get caught shipping a house out of code or not stamped and approved, we're going to get fined heavily.

Q.  Now when you say stamped and approved, I would say they're stamping and approving the plan?

A.  The actual house, the actual house.  The plan – the plan itself is stamped and then the actual house that's constructed is inspected and signed off on by a third party

7

inspector of the state of Ohio as it's constructed down the line.  So --

Q.  Are you talking about as it's constructed at Ritz-Craft?

A.  At Ritz-Craft, correct.

(McKeon Dep. 26-27.)  It is undisputed that the Model Home was inspected and approved pursuant to this system before it left the Ritz-Craft factory in Michigan.  (*See* Bindus Decl. ¶ 14, Doc. 58-4.)

### d.      Sub-Contractors Involved in Assembling the Components of the Model Home

Ritz-Craft entered into a "Set Crew Agreement" with Citadel dated October 24, 2004.  (Set Crew Agreement, Doc. 45-2.)  Citadel assembled the components received from Ritz-Craft.  In addition, the Greens (as opposed to Ritz-Craft or Flex Homes) contracted with various sub-contractors, who completed the installation and finished the interior and exterior of the Model Home, including the electrical work, HVAC, and plumbing.  (*See* I. Green Dep. 29; 50-56.)  The Geauga County Building Department then approved the Model Home for occupancy.  (*Id*. 240.)

### e.      Complaints Regarding Defects Concerning the Model Home

Nonetheless, from the day it was set to the present, the Greens have complained of various defects in the design, construction, and installation of the Model Home.  (*See, e.g.*, Bindus Dep. 29-30; I. Green Dep. 234-36; Compl. ¶ 10.)  Paragraph 10 of the Complaint lists over a dozen examples of alleged defects relating to the design, delivery, and installation of the Model Home.  Ingrid Green's deposition, moreover, includes hours of testimony regarding problems with the Model Home, her communications with Ritz-Craft about those problems, and efforts to address them.  (*See generally* I. Green Dep.)  Her testimony discusses pervasive problems throughout the home, many of which would make her family's daily life significantly more difficult.  Because they believed these

8

defects were so significant that they would effectively prevent profitable re-sale, the Greens moved into the Model Home themselves in the summer of 2005.  (I. Green Dep. 145, 242.)[8]  At her deposition, Ingrid Green distilled her grievances as follows:

> [M]y biggest complaint here is that Ritz-Craft failed to follow the state approved prints.  If they would have just followed those prints, I would not be experiencing this, nor will I have to disclose those problems to a future customer who would want to buy this house.  This is why I had to move into this house, and I have to deal with this on a daily basis, and to be quite honest, I resent that fact.

(*Id.*)  Ultimately, the parties' disagreements regarding which party caused and is legally responsible for these alleged defects ripened into this lawsuit.

## B.    PROCEDURAL HISTORY

### 1.    Removal & Complaint

On February 23, 2007, Flex Homes and the Greens filed suit in the Court of Common Pleas, Geauga County, Ohio alleging six counts relating to the delivery, installation, and design of various components of the Model Home.  On April 5, 2007, the Defendants removed the case to this Court. At the time of removal, the Complaint alleged the following six claims:

Count I:        Breach of Contract, asserted by both Plaintiffs;

---

[8]  At her deposition, Ingrid Green explained why the Greens felt they had to move into the Model Home:

> All the complaints under my material defects list made it very difficult for me to market it as a model home, to sell.
>
> I mean, this is why my husband and I are living in this house.  It was not our intention – we had a beautiful home where we were, a gorgeous pond we overlooked, a 50 acre preserve in our backyard, wonderful neighborhood, and because of these material defects we were forced to purchase this, move into it, sell our home at a rock bottom price because we didn't want to carry two loans.

(I. Green Dep. 145.)

| | | |
|---|---|---|
| Count II: | Breach of Implied Warranty of Workmanship, asserted by both Plaintiffs; | |
| Count III: | Breach of the Implied Warranties of Merchantability and Fitness, asserted by both Plaintiffs; | |
| Count IV: | Negligence, asserted by both Plaintiffs; | |
| Count V: | Products Liability, asserted by both Plaintiffs; | |
| Count VI: | Ohio Consumer Sales Practices Act ("OCSPA"), asserted by the Greens only. | |

The Plaintiffs requested compensatory and punitive damages with respect to the first five counts.[9]

In addition, Flex Homes asserted an entitlement to damages for lost or canceled sales in connection

with its breach of contract claim, although it did not allege that any particular sale was cancelled or

failed to come to fruition.

### 2.     The Court's Order Resolving Ritz-Craft's Partial Motion to Dismiss

Ritz-Craft filed a partial motion to dismiss the complaint pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  (Partial Motion to Dismiss, Doc. 6.)  On March 18, 2008, the

Court issued an Opinion and Order granting, in part, Ritz-Craft's Partial Motion to Dismiss.  (Mar.

18 Opinion & Order, Doc. 22.)  Specifically, the Court first found that the claims arising under the

Builder Agreement are governed by Pennsylvania law based on the choice of law provision in that

contract.  Next, the Court dismissed the following claims: the Greens' Breach of Contract claim

(Count I); Flex Homes' Breach of Implied Warranty of Workmanship claim (Count II); all Plaintiffs'

---

[9]  Flex Homes requested $1,000,000.00 in compensatory damages and the same amount in punitive damages in connection with Counts I-V.  The Greens requested $175,000.00 in compensatory damages and the same amount in punitive damages in connection with Counts I-V, and $525,000.00 in connection with Count VI.  Both Plaintiffs seek attorney fees and costs. (Doc. 1-2 at 8-9.)

10

Breach of Implied Warranties of Merchantability and Fitness claims (Count III); Flex Homes'

Negligence claim (Count IV); and any OCSPA claims that may have been asserted by Flex Homes

(Count VI).  (*Id*. at 23.)  In addition, the Court dismissed Flex Homes' claims for lost or cancelled

sales and found that the complaint failed to adequately plead an entitlement to punitive damages.

Although the Court permitted the Plaintiffs to file an amended complaint including facts sufficient

to support a claim for punitive damages, they did not do so within the time allotted.

Accordingly, after the Court's March 18 Opinion & Order, the claims remaining in this

lawsuit are:

| | |
|---|---|
| Count I: | Flex Homes' Breach of Contract claim; |
| Count II: | The Greens' Implied Warranty of Workmanship claim; |
| Count IV: | The Greens' Negligent design, manufacture, and installation claims; |
| Count V: | Flex Homes' Products Liability claim; |
| Count V: | The Greens' Products Liability claim; and |
| Count VI: | The Greens' OCSPA claim. |

### 3.    Ritz-Craft's Partial Motion for Summary Judgment (Doc. 51)

The motion for partial summary judgment now ripe and pending before the Court seeks

judgment as a matter of law with respect to the following claims:

| | |
|---|---|
| Count I: | Flex Homes' Breach of Contract claim; |
| Count V: | Flex Homes' Products Liability claim; |
| Count VI: | The Greens' OCSPA claim; and |
| Count IV: | Some, but not all, of the Greens' negligent design, manufacture, and installation claims – specifically, the claims relating to (1) the <u>design</u> and <u>manufacture</u> of the electrical system; (2) the <u>design</u> and <u>installation</u> of the |

11

foyer staircase; and (3) the <u>design</u> of the windows, bay window and its roof, sink and fixtures, flooring, carpeting, cabinetry, the venting system, plumbing and bath components, and the roof.

Count V:     The Greens' Products Liability claim.

(Doc. 51 at 1-10.)

Ritz-Craft's motion for partial summary judgment does <u>not</u> seek dismissal of the Greens' Implied Warranty of Workmanship claim and some aspects of their Negligence claims.  Specifically, with respect to the latter, Ritz-Craft is <u>not</u> seeking dismissal of the negligent <u>manufacture</u> aspect of any of its Negligence claims (with the exception of the negligent manufacture of the electrical system) or of the negligent design of the foundation.[10]   Accordingly, these claims will still be pending regardless of the Court's resolution of the Partial MSJ.

The Court will analyze each of the claims for which Ritz-Craft is seeking summary judgment in turn.

## III.     <u>LAW AND ANALYSIS</u>

### A.     **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions and provides in pertinent part:

The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

---

[10]  Although it is somewhat difficult to decipher exactly for which aspects of the Negligence claim Ritz-Craft is seeking summary judgment, the Court's conclusion regarding the claims presently at issue is based on careful analysis and comparison of the Complaint and the Partial MSJ.  (*See* Compl. ¶¶ 10, 22-26; Partial MSJ at 1-10.)

Fed. R. Civ. P. 56(c)(2).

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim. *Moldowan v. City of Warren*, 570 F.3d 698, 719 (6th Cir. 2009); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989). The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curto v. Harper Woods*, 954 F.2d 1237, 1241 (6th Cir. 1992) (quoting *Ceolotex*, 477 U.S. at 322); *Ocean Innovations, Inc. v. Quarterberth, Inc.*, No. 1:03-CV-0913, 2009 U.S. Dist. LEXIS 54108, at *8-9 (N.D. Ohio June 26, 2009) (citing *Ceolotex*, 477 U.S. at 322).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials

13

in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment;" rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (emphasis in original) (internal quotations omitted).

**B.    Discussion**

Ritz-Craft's Partial MSJ asserts that there is no genuine issue of material fact with respect to the claims identified above, such that it is entitled to judgment as a matter of law.  The Court will address each claim, starting with Flex Homes' claims.

14

### 1.       Count One: Flex Homes' Breach of Contract Claim

Count I of the Plaintiffs' Complaint alleges that Ritz-Craft breached its contract with Flex Homes, *i.e.*, the Builder Agreement.  Under the Builder Agreement, Flex Homes agreed to purchase pre-manufactured components of residential houses from Ritz-Craft, with the understanding that Flex Homes would sell the houses to consumers such as the Greens.  Flex Homes[11] alleges that the breach occurred when Ritz-Craft allegedly failed to properly design, manufacture, deliver, and assemble ("set") the first of the pre-manufactured homes governed by the Builder Agreement, *i.e.*, the Model Home at 18715 Auburn Glen Drive, which serves as the Greens' current residence. (Doc. 1-2 ¶ 10.)

### i.       Governing Law

 The Builder Agreement includes a "Governing Law" provision that states:

> This AGREEMENT shall be governed by, construed, and enforced in accordance with, the laws of Pennsylvania without regard to its principles of conflict of law.

(Doc. 1-2 at 14 (Builder Agreement, § 9(c)).)  In the March 18 Opinion & Order, the Court held that this provision establishes that Pennsylvania law applies to disputes arising under the Builder Agreement.  (March 18 Opinion and Order at 6.)  This is now the law of the case.  (*Id*.)

### ii.      Ritz-Craft's Argument that Summary Judgment is Appropriate with respect to the Breach of Contract Claim

The elements of breach of contract in Pennsylvania are (1) the existence of a valid, binding contract; (2) compliance with the terms of that contract by the plaintiff; (3) breach by the defendant; and (4) damages resulting from the defendant's breach.  *See Gundlach v. Reinstein*, 924 F. Supp.

---

[11]  The Court dismissed the Greens' Breach of Contract claim in the March 18 Opinion & Order, finding that, under Pennsylvania law, they are neither a party to, nor an intended third-party beneficiary of, the Builder Agreement.  (March 18 Opinion & Order.)

684, 688 (E.D. Pa. 1996).  The only element of Flex Homes' Breach of Contract claim that Ritz-Craft contests is damages.  (Partial MSJ at 13.)[12]

Ritz-Craft's argument on this point is simple: it says that Inga Dollinger, Flex Homes' owner and President, "admitted that Flex Homes has not sustained any damages with respect to the transaction that is the subject of this lawsuit – the purchase of the Ritz-Craft home." (*Id.*)  Ritz-Craft accurately quotes the following testimony from Dollinger's deposition:

Q. [D]oes Flex Homes, Inc. have any out-of-pocket costs as far as the damages to the Green home?  In other words, did Flex Homes pay any contractors to make repairs to the Green home or was that all paid for by the Greens?

A.  The Greens paid for that.  Yes.

Q.  So Flex Homes has no out-of-pocket repair costs concerning the Greens' home?

A.  Not that I can think of.

(Dollinger Dep. 162.)  Ritz-Craft points out that it is undisputed that the Greens, not Flex Homes, paid for the Model Home, and secured the mortgage financing.  In addition, Ritz-Craft notes that the Court dismissed Flex Homes' claim for lost or cancelled potential sales based on the limitation of

---

[12] Ritz-Craft specifically notes, however, that it does not <u>concede</u> that it breached the Builder Agreement.  (Partial MSJ at 13, n.2.)  Instead, it argues that, even assuming a breach, Flex Homes cannot prove damages.  (*Id.*)

16

liability clause in the contract.[13]  In sum, the Court stated:

> Flex Homes' claims for lost or cancelled sales are **DISMISSED**.  As stated in the Builder Agreement, Flex Homes is limited to recovering the price of the sale, *i.e.*, the amount it paid Ritz-Craft in connection with the prefabricated house that the Greens ultimately purchased.

(*Id*. at 21.)  Ritz-Craft argues that the Court's holding unequivocally precludes Flex Homes from asserting a claim for damages in light of Dollinger's express admission that <u>Flex Homes</u> (unlike the Greens) did not suffer any out-of-pocket monetary losses in connection with the Model Home.

In response, Flex Homes points to the undisputed fact that the Greens bought the Model Home from Ritz-Craft for Flex Homes as a business proposition – they never intended to make it their personal residence.  (Opp'n Br. at 8.)  The profit from the sale of the Model Home would have been split between the Greens and Flex Homes.  (K. Green Dep. 25-26.)  Flex Homes notes, moreover, that the Greens only moved into the Model Home because its material defects effectively prevented them from selling it for a profit.  (Opp'n Br. at 8.)  Flex Homes then describes cost estimates to repair the defects (based on appraisals attached to the brief), concluding that Flex Homes

---

[13]  The limitation of liability clause in the Builder Agreement provides:

> DEALER REMEDIES ARE LIMITED.  DEALER MAY NOT RECOVER ANY LOSS OF PROFITS, INDIRECT, SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES ARISING OUT OF ANY BREACH OF WARRANTY OR CONTRACT.  SUCH DAMAGES ARE EXCLUDED FROM THIS CONTRACT.  RITZ-CRAFT'S MAXIMUM RESPONSIBILITY IN DAMAGES FOR ANY SALE IS LIMITED TO THE PRICE CHARGED FOR THAT SALE.

(Builder Agreement § 10.)

17

suffered damages in the amount of $123,500.00, *i.e.*, half[14] of the difference between the impaired and unimpaired value of the Model Home.  (*Id.* at 9.)

Flex Homes does not rebut Dollinger's testimony that Flex Homes has not suffered any out-of-pocket loss in connection with the Model Home, nor does it mention the Court's holding regarding the limitation of liability clause in the Builder Agreement.  This is the dispositive issue, and it is fatal to Flex Homes' Breach of Contract claim.  The damages Flex Homes identifies – half of the difference between the impaired and unimpaired value of the Model Home – is a measure of damages tied to Flex Homes' potential profit, assuming it could sell the Model Home for full market value.[15]  The limitation of liability clause is an agreed remedy that permits Flex Homes to recover only for damages tied to the purchase of the pre-fabricated home: "RITZ-CRAFT'S MAXIMUM RESPONSIBILITY IN DAMAGES FOR ANY SALE IS LIMITED TO THE PRICE CHARGED FOR THAT SALE."  (Builder Agreement § 10.)  In fact, Flex Homes did not incur <u>any</u> costs in connection with the purchase of the Model Home – the Greens, not Flex Homes, bought it, paid the sub-contractors, and have paid for repairs to date.  The limitation of liability clause in the Builder Agreement therefore bars this claim.

Accordingly, Flex Homes' Breach of Contract claim is **DISMISSED** because there is no

---

[14]  Flex Homes asserts that the other half goes to the Greens based upon the pre-arranged plan to split the proceeds of the sale of the Model Home.  Ritz-Craft disputes that the evidence establishes this pre-arrangement.  Although it is not clear that the family had a specific plan to split the proceeds 50/50, construing the evidence in the light most favorable to Flex Homes, there is sufficient evidence to find that Flex Homes and the Greens intended to split the proceeds of the sale in order to reimburse the Greens for their initial purchase of the Model Home.

[15]  Ritz-Craft also argues that this measure of damages is speculative because it is based on a hypothetical sale at fair market value (of both the impaired and unimpaired home).  The Court need not address this argument in light of the limitation of liability clause in the Builder Agreement.

issue of material fact with respect to damages and Ritz-Craft is entitled to judgment as a matter of law.

### 2.    Count V: Flex Homes' Product Liability Claims

Flex Homes' Products Liability claim is a manufacturing defects claim.  (Compl. ¶ 27.)  The Complaint alleges as follows:

> The pre-manufactured house components manufactured and sold by Ritz-Craft pursuant to the Contract deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards.

(*Id.*)  Ritz-Craft treats this as a strict product liability manufacturing defect claim under Pennsylvania law, and recites the elements of the cause of action.  (Partial MSJ at 14.)[16]  Ritz-Craft argues that, for the same reasons discussed above with respect to Flex Homes' Breach of Contract claim, Flex Homes cannot prove <u>harm</u>, a component of the third element of a manufacturing defect under Pennsylvania law.  In addition, Ritz-Craft argues that the economic loss rule bars Flex Homes' products liability claim.  (Partial MSJ at 14-15.)  It contends that, under Pennsylvania's economic loss rule, the existence of a contract limits recovery of purely economic losses to actions based on the contract.

Flex Homes does not dispute that, if the economic loss rule applies, it bars recovery.  (Opp'n Br. at 9-11.)  Instead, it argues that Pennsylvania law does not apply to the products liability claim

---

[16] Ritz-Craft sets forth the elements of strict product liability in Pennsylvania as follows:
(1)    the product was defective;
(2)    the defect existed when it left the hands of the defendant;
(3)    the defect caused the harm.
(Partial MSJ at 14 (citing *Peaco v. GF Mgmt. of Pa., Inc.*, 2003 U.S. Dist. LEXIS 21017, at *6-7 (E.D. Pa. Nov. 13, 2003) (citing *Dansak v. Cameron Coca-Cola Bottling Co., Inc.*, 703 A.2d 489, 495 (Pa. Super. Ct. 1997)).)

and that the economic loss rule does not apply under Ohio law. Flex Homes details the standards for resolving conflicts of law under Ohio law, and concludes that the factors favor applying Ohio law to this claim rather than Pennsylvania law.

Although Flex Homes understandably raises choice of law, a complex issue without an immediately apparent resolution in this case, choice of law is not dispositive. This is because Ohio law – Flex Homes' preferred jurisprudence – bars Flex Homes' product liability claim under Ohio's version of the economic loss rule. In *HDM Flugservice GmbH v. Parker Hannifin Corp.*, the Sixth Circuit summarized Ohio's approach to the economic loss rule as follows:

> Ohio developed its approach to the economic loss rule in two major stages. Ohio initially rejected the rule and allowed tort recovery for economic losses. *See Inglis v. Am. Motors Corp.*, 3 Ohio St. 2d 132, 209 N.E.2d 583 (1965); *Iacono v. Anderson Concrete Corp.*, 42 Ohio St. 88, 326 N.E.2d 267 (1975). Then, in *Chemtrol*, the Ohio Supreme Court limited its previous holdings by applying the economic loss rule to parties in privity of contract, stating:
>
>> a commercial buyer seeking recovery from the seller for economic losses resulting from damage to the defective product itself may maintain a contract action for breach of warranty under the Uniform Commercial Code; however, in the absence of injury to persons or damages to other property the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence.
>
> 537 N.E.2d at 635. Thus, if the parties have a contractual relationship, they may not sue in strict liability or implied warranty for their economic damages, but instead must rely on the Uniform Commercial Code's ("U.C.C.") contractual remedies.

332 F.3d 1025, 1029 (6th Cir. 2003) (noting that in *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 632 (Ohio 1989), the Ohio Supreme Court "held that implied warranty claims and strict liability claims are treated identically under the economic loss rule."). Flex Homes is undisputedly in privity of contract with Ritz-Craft, and alleges purely economic damages resulting

20

from Ritz-Craft's alleged failure to perform under the Builder Agreement.  Indeed, the damages Flex Homes details in its response brief – the difference between the impaired and unimpaired market value of the Model Home – is a "direct" economic loss.  *Id*. at 1028 ("Generally, this type of damages encompasses 'the difference between the actual value of the defective product and the value it would have had had it not been defective.'" (quoting *Chemtrol*, 537 N.E. 2d at 629)).  Therefore, even if Ohio law applies to Flex Homes' products liability claim, the damages Flex Homes asserts are barred by the economic loss rule and, accordingly, there is no genuine issue of material fact with respect to Flex Homes' Products Liability claim.[17]  Ritz-Craft is entitled to judgment as a matter of law, and this claim is **DISMISSED**.

All of Flex Homes' claims have now been **DISMISSED** from this lawsuit.

### 3.     The Greens' OCSPA Claim

Ritz-Craft seeks summary judgment with respect to the Greens' OCSPA claim (O.R.C. § 1345.01) on the grounds that it is undisputed that <u>profit</u> was the Greens' sole motive in purchasing the Model Home.  (Partial MSJ at 16-20.)  Ritz-Craft argues that the Greens' admitted profit motive places the transaction outside the bounds of the OCSPA, because the statute "does not apply to items purchased or leased primarily for use in the individual's business."  (*Id*. at 17.)  In support of its position, Ritz-Craft cites two Ohio cases in which the Ohio Court of Appeals held that the OCSPA did not apply because the transaction did not involve a <u>consumer</u> purchase: *Lesco v. Toyota of Bedford, Inc.*, 2005-Ohio-6724, 2005 WL 3475769 (Ohio Ct. App. Dec. 20, 2005) and *Ostrander v. Andrew*, 2000 WL 697453 (Ohio Ct. App. May 31, 2000).  (*Id*. at 17-18.)

---

[17]  Again, Ritz-Craft's argument that Pennsylvania's economic loss doctrine bars this claim is unrebutted.

For their part, the Greens do not dispute that they originally <u>intended</u> to use the Model Home for business purposes only, but note that they actually paid for the Model Home, and have consistently used it exclusively as a private residence.  (Opp'n Br. at 12.)  The Greens argue that *Lesco* is distinguishable because, in that case, the purchaser used the vehicle in question for business purposes 95 percent of the time (unlike the Greens, who never use the Model Home for business purposes).[18]  (*Id*.)  Similarly, the Greens submit that *Ostrander* is distinguishable because the purchaser paid for the computer in question with a check drawn on a business account (here, it is undisputed that the Greens personally paid for the home in question).  (*Id*.)

Because it is undisputed that the Greens did <u>not</u> <u>intend</u> to purchase the home for their <u>personal</u> use, the issue is whether, for OCSPA purposes, the purchaser's intent matters.  The OCSPA prohibits unfair, deceptive, or unconscionable practices in consumer transactions.  *See* O.R.C. §§ 1345.02; 1345.03.  The statute defines "consumer transaction" as follows:

> "Consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things.

O.R.C. § 1345.01.  Ohio courts have used a totality of the circumstances test to determine whether a transaction is a "consumer transaction" for purposes of the OCSPA.  *See Gugliotta v. Morano*, 829 N.E.2d 757, 766 (Ohio Ct. App. 2005).  In *Gugliotta*, the Ohio Court of Appeals articulated the general rule as follows:

> whether or not a consumer transaction has been entered into between the parties 'will be based upon the objective manifestations of the parties, as set forth by the totality of the circumstances surrounding the transactions' **at the time the parties entered**

---

[18]  Inga Dollinger stated in her deposition, however, that, initially, Flex Homes showed the house to some prospective customers.  (Dollinger Dep. 87.)

> **into a binding agreement**.

*Id*. (quoting *Tomas v. George Ballas Leasing*, 1986 WL 11420 (Ohio App. Ct. Sept. 30, 1986)) (emphasis added).

As stated in *Gugliotta*, the relevant time for determining whether a transaction is a "consumer transaction" is "the time the parties entered into a binding agreement." *Id*.  In fact, *Tomas* directly addressed this timing issue in a case in which an individual purchased a van intending to use it for business purposes, but, soon after the purchase, began employing it for personal use only.  *Tomas*, 1986 WL 11420 at *3.  The Ohio Court of Appeals held that, because, <u>at the time of the purchase</u>, the plaintiff intended to use the van for business purposes, the transaction was not a "consumer transaction" covered by the OCSPA.  *Id*. at *4 (reasoning that this timing rule "prevents any uncertainty in the status of the parties due to subsequent events, it provides a definite point in time for the creditors to act, and it prevents any potential mischief by the buyer."); *see also Couto v. Gibson, Inc.*, 1992 WL 37800, at *7 (Ohio App. Ct. Feb. 26, 1992) (following *Tomas* on this issue); *Jackson v. Krieger Ford, Inc.*, 1989 WL 29351, at *3 (Ohio App. Ct. Mar. 28, 1989) (following *Tomas* on this issue); *Hines v. Thermal-Guard of Ohio, Inc.*, 546 N.E. 2d 487, 489 (Ohio Mun. Ct. 1988) (following *Tomas* on this issue).  Applying the *Tomas* rule in this case, at the time of the purchase, it is undisputed that the Greens intended to use the Model Home for strictly business purposes.  Therefore, this is not a "consumer transaction" under the OCSPA.[19]

---

[19]  There is authority holding that, when the principal use of the product is uncertain or ambiguous at the time of the purchase, the Court should consider the use of the product <u>after</u> the purchase.  *See Krieger Ford*, 1989 WL 19351 at *3.  This authority is inapplicable here, however, since it is undisputed that the Greens' intention at the time of the purchase was to use the home for business purposes.  (*See, e.g.*, I. Green Dep. 57-58, 60-61; K. Green Dep. 18-19, 24; *see also* Dollingerer Dep. 87.)

23

The distinctions the Greens raise between this case and *Lecso* and *Ostrander* are valid.  In light of the totality of the circumstances test for "consumer transaction," and the fact that the Greens' undisputed intent at the relevant time was exclusively business-related, however, these distinctions are not particularly meaningful.  Although the Greens paid for the Model Home out of their own pocket, they did so with the clear and express understanding that they were making an investment in Flex Homes' business.  Indeed, they did so pursuant to a written contract with Flex Homes.  Accordingly, the transaction at issue was not a "consumer transaction" as defined by the OCSPA.  Therefore, Ritz-Craft is entitled to summary judgment with respect to the Greens' OCSPA claim and it is **DISMISSED**.

### 4. Counts IV and V: The Greens' Product Liability & Negligence Claims

The Greens' remaining claims assert an entitlement to relief based on design, manufacturing, and installation defects in connection with the Model Home.  More specifically, Counts IV and V of the Complaint provide, in pertinent part, as follows:

**Count 4: Negligence**

. . .

23. Ritz-Craft, Citadel, and John Doe defendants had a duty to Plaintiffs to supply products designed, manufactured, and installed to industry standards, and per the parties' specifications as set forth in the Contract.
24. Defendants breached that duty.
25. It was foreseeable to the Defendants that Plaintiffs would suffer the damages they have and continued to suffer as a result of Defendants' breach of their duty.
26. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered the damages set forth in Paragraphs 10 and 11, *supra*.

**Count 5: Products Liability**

27. The pre-manufactured house components manufactured and sold by Ritz-Craft pursuant to the Contract deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or

24

from otherwise identical units manufactured to the same design specifications, formula, or performance standards.

28. As a direct and proximate result of the above-described defects, Plaintiffs have suffered the damages set forth in Paragraphs 10 and 11, *supra*, and the Greens have suffered extreme emotional distress over the shambles that their home has become.

(Compl. ¶¶ 23-28.)

Ritz-Craft seeks summary judgment with respect to these claims, although it divides the Negligence claim into numerous claims and only seeks summary judgment with respect to some of them.  Further, it assumes, apparently inaccurately,[20] that the Greens' Product Liability claim arises under the Ohio Products Liability Act rather than common law. (Partial MSJ at 20.)

The Court will address the Negligence claims first.[21]

### a.    The Greens' Negligence Claims

Ritz-Craft did not assert a Rule 12(b)(6) challenge to the Greens' Negligence claims. Similarly, Ritz-Craft is not now arguing that the Greens' Negligence claims are legally flawed. Instead, it argues that the Greens cannot prove essential elements of their Negligent Manufacture, Design, and Installation claims based on the facts developed in discovery. More specifically, Ritz-Craft argues that there is no evidence that it violated the applicable standards of care or that its conduct was the proximate cause of the problems the Greens have had with the Model Home. Accordingly, Ritz-Craft appears to concede the legal validity of the Greens' Negligence claims

---

[20]  In their response brief, the Greens expressly state that they are not asserting a claim under the Ohio Product Liability Act.  Instead, they characterize their claim as "a common-law product liability claim."  (Opp'n Br. at 13.)

[21]  Ohio courts have noted that common law claims for strict liability and negligent product design are "complementary but distinct" claims. *Hertzfeld v. Hayward Pool Products, Inc.*, No. L-07-1168, 2007-Ohio-7097, 2007 Ohio App. LEXIS 6213, ¶ 57 (Ohio App. Ct. 2007).

25

against it.[22]  In addition, Ritz-Craft specifically notes that it is <u>not</u> seeking summary judgment with

respect to the majority of the <u>Manufacturing</u> defect claims the Greens may be asserting.  (Reply Br.

at 18 n.11 ("Ritz-Craft disputes that manufacture of the items alleged was defective in any manner.

However, for purposes of this motion, Ritz-Craft is only moving for summary judgment concerning

the design of the various components.").)  Therefore, as briefed by the parties, the issue is whether

---

[22]  Although Ritz-Craft has not raised the issue, it appears that Ohio law allows a consumer to assert a negligent design claim against a manufacturer in connection with an allegedly defective product, even if that claim is only for harm to the product itself.  The Ohio Supreme Court has held that "the common-law action of negligent design survives the enactment of the Ohio Products Liability Act, R.C. 2307.71 *et seq*."  *Carrel v. Allied Products, Corp.*, 677 N.E.2d 795, 800 (Ohio 1997); *see also Tompkin v. Am. Brands*, 219 F.3d 566, 580 (6th Cir. 2000) (noting that *Carrel* held that common law negligent design claims are not preempted by the Ohio Products Liability Act).  Indeed, the court noted that "all common-law products liability causes of action survive the enactment" of the Act "unless specifically covered by the Act."  *Id.*

Effective April 7, 2005, the Ohio General Assembly amended several of the product liability statutes and stated its intent to supersede *Carrel*.  *See* S.B. 80, Section 3(D). Specifically, the General Assembly added R.C. 2307.71(B), which states that: "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability causes of action." Ohio courts have found that the S.B. 80 amendments do not apply retroactively, however.  *Hertzfeld*, 2007 Ohio App. LEXIS 6213 at ¶ 56 (noting that the "state of products liability law as of the date the cause of action arose applies"). As a result, where the cause of action arose prior to April 7, 2005 amendment, courts will apply the previous version of the statute which permitted a common law negligent design claim.  *Luthman v. Minster Supply Co.*, No. 2-06-43, 2008-Ohio-165, 2008 Ohio App. LEXIS 139, ¶ 15 (finding that because the cause of action arose prior to the April 7, 2005 effective date, even though the complaint was filed on June 5, 2005, the amendment to R.C. 2307.71 did not apply); *see also Doty v. Fellhauer Electric, Inc.*, 175 Ohio App. 3d 681, 2008-Ohio-1296, 888 N.E.2d 1138, ¶ 36 ("Although R.C. 2307.71 clearly states the intent to abrogate all common law product liability claims, it does not provide that causes of action accruing prior to the effective date would be subject to the amendment."); *LeBeau v. Lembo Corp.*, No. 5:06-CV-00502, 2008 U.S. Dist. LEXIS 85190, *10 (N.D. Ohio Aug. 15, 2008) (nothing that "[t]he April 7, 2005 amendment to the Ohio Products Liability Act will not abrogate LeBeau's common law claim that accrued before the amendment's effective date because the legislature did not make clear its intent that courts apply the statute retrospectively").

the Greens' evidence of negligence is sufficient to establish a genuine issue of material fact with respect to certain of their negligence claims.

### i.    The Greens' Negligent Design & Manufacturing Claims Regarding the Electrical System

Common law negligence consists of four familiar elements: (1) duty; (2) breach; (3) causation; and (4) damages. *See Moeller v. Auglaize Erie Mach. Co.*, 2009 WL 161784, at *6 (Ohio App. Ct. Jan. 26, 2009). Under Ohio law, "it is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended." *York v. Am. Med. Sys., Inc.*, No. C1-94-824, 1997 U.S. Dist. LEXIS 24212, *17-18 (S.D. Ohio Oct. 16, 1997) (citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 326, 364 N.E.2d 267 (1977)). To establish breach of that duty, "a plaintiff must introduce evidence that tends to show that the manufacturer did not design the product with reasonable care." *Id*. at *18 (citing *Sours v. General Motors Corp.*, 717 F.2d 1511, 1517 (6th Cir. 1983)). Furthermore, with respect to a claim for negligent manufacture, The Restatement (Third) of Torts, § 2 (1998), provides, in part, that a product:

> contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product

A product is negligently manufactured under Ohio law "if it differs in a material way from its design specifications or from otherwise identical units." *Najib v. Meridian Medical Tech., Inc.*, No. C2-03-CV-1269, 2005 U.S. Dist. LEXIS 9336, *15 (S.D. Ohio April 25, 2005), *rev'd on other grounds*, 179 Fed. Appx. 257 (6th Cir. Apr. 27, 2006).

Ritz-Craft's    first    argument    relates    to    the    alleged    negligent    design    and

27

installation/manufacturing defects in the Model Home's electrical system.  In short, Ritz-Craft argues that, "[b]ased on the evidence of record, the [Greens] cannot prove that any act or omission of Ritz-Craft was the proximate cause of the electrical issues that the [Greens] claim to experience."  (Partial MSJ at 23.)  Although the Greens submitted an expert report by Michael Thompson ("Thompson Report," Doc. 51-6),[23] Ritz-Craft argues that the report is devoid of any indication that Ritz-Craft's <u>design</u> (as opposed to installation) of the electrical system was defective.  (*Id*.)  Therefore, Ritz-Craft argues that the Greens have failed to present any evidence establishing that the design of the electrical system caused the alleged defects.  (*Id*.)  Indeed, Ritz-Craft's own expert inspected the Model Home and concluded that none of the electrical issues referenced by the Greens are attributable to Ritz-Craft's design.

> Mr. Tegeler [*i.e.*, Ritz-Craft's expert] concluded that the electrical system as designed by Ritz-Craft was approved by the State of Ohio in compliance with the 2002 Electrical Code; that the building was inspected at the manufacturing plan[t] and found to be in compliance with the applicable code and approved plans; [and] that the problem was with the site installation.  Had the site installation of the electrical system been done per the approved plans, it would have met the electrical code.

(*Id*. at 23-24; *see also* "Tegeler Report," Doc. 51-7.)

In response, the Greens argue that Ritz-Craft is ignoring the close relationship between the design and manufacturing of the electrical system.  That is, the electrical system is a designed-in

---

[23] Ritz-Craft notes that, because the "expert" who prepared the report did not attach a *curriculum vitae*, it is impossible to determine whether he is actually qualified to act as an expert. (Partial MSJ at 23 n.7.)  Ritz-Craft states that it will assume his status as an expert for purposes of this motion only, reserving its right to challenge that designation in the future.  (*Id*.)  This is somewhat curious given the parties' respective discovery obligations and rights with respect to the use of experts; because the parties do not press these issues now, the Court does not address them, however.

feature of the components of a Ritz-Craft home such that, when the pre-fabricated home leaves the Ritz-Craft factory, the electrical wiring is behind drywall; the design is literally embedded in the manufacturing.  (Opp'n Br. at 14-15.)  According to the Greens, this is significant because there is evidence that the electrical <u>system</u> is flawed and will have to be replaced.  Specifically, the Greens point to their expert's conclusion that "it will be necessary to rewire this entire structure[,]" (Thompson Report) and testimony by Ingrid Green indicating that during installation, B&L Electric informed her of a number of discrepancies between (1) the plans Ritz-Craft had submitted to the state and to her and (2) the actual configuration of the electrical system in the components Ritz-Craft shipped.  (I. Green Dep. at 193; *see generally id.* at 165-98.)

> **1.     Ritz-Craft is Entitled to Summary Judgment Dismissing the Greens' Negligent Design Claim in Connection with the Electrical System**

Both parties' positions have merit.  Ritz-Craft is correct that there is no evidence specific to defects in the <u>design</u> of the electrical system.  In other words, the Greens have not submitted any evidence indicating that the intended design of the electrical system for the Model Home was defective.  First, the Thompson Report (which is striking in its brevity) does not make any connection between the defects in the electrical system Thompson observed during his inspection of the Model Home and the intended <u>design</u> of that system.  Second, Ingrid Green's testimony summarizes the problems B&L Electric had during the on-site installation of the electrical system, but does not suggest that Ritz-Craft's design was faulty.  In fact, she testified that the issue was that the components Ritz-Craft shipped did not conform to the plans she had received and the state had approved.  (I. Green Dep. 242 ("[M]y biggest complaint here is that Ritz-Craft failed to follow the

state approved prints.  If they would have just followed those prints, I would not be experiencing this[.]"); *see also id*. 193, 195.)  This indicates that the <u>design</u> reflected in the plans she received was acceptable and consistent with her expectations.  Accordingly, Ritz-Craft is entitled to summary judgment with respect to any negligent <u>design</u> claims asserted by the Greens in connection with the electrical system.[24]

> **2.     Ritz-Craft is Not Entitled to Summary Judgment
> Dismissing the Greens' Negligent Manufacturing
> Claim in Connection with the Electrical System**

The Greens, however, have raised material issues of fact with respect to whether the electrical system was defective as <u>manufactured</u> by Ritz-Craft.  In other words, there is a genuine issue of material fact as to whether Ritz-Craft negligently manufactured the electrical system when it assembled that system at its Michigan factory prior to shipping the components of the Model Home to Ohio.  Ingrid Green's extensive testimony regarding the problems B&L Electric encountered during the on-site installation of the electrical system provides evidence of defects in the manufacturing of the electrical system.  Ingrid Green's testimony goes beyond identification of problems with the electrical system.  She explains that B&L Electric informed her of numerous instances of inconsistencies between the plans and the actual electrical system Ritz-Craft delivered. (I. Green Dep. at 165-98.)  For example, she testified that B&L Electric told her that an outlet in the bathroom was wired to a light in the hallway, a configuration different from that depicted in the plans and which was neither safe nor compliant with state code.  (*Id*. 192-93.)

---

[24]  The fact that the design was embedded in the manufactured components Ritz-Craft shipped does not undermine the distinction between design defects and manufacturing defects.  A plan (*i.e.*, the design) can be perfect while its execution (*i.e.*, manufacturing) is defective.

Ritz-Craft's expert's report conflicts with this testimony.  Specifically, the Tegeler Report states that the components of the Model Home were inspected and tested before they left the Ritz-Craft factory, and were approved as compliant with the applicable state codes.  (Tegeler Report at 1-4.)  Tegeler thus concludes that B&L Electric improperly installed the electrical system on-site, and is therefore responsible for any resulting defects.  (*Id.*)  In addition, Ritz-Craft notes that the Geauga County Building Inspector approved the electrical system as safe for occupancy <u>after</u> the on-site installation by B&L Electric.  (I. Green Dep. 240.)

The parties agree that "had the site installation of the electrical system been done per the approved plans, it would have met the electrical codes."  There is a material issue of fact, however, as to whether the site installation was not done according to the approved plans because (1) Ritz-Craft delivered the components of the system in a condition or configuration that made it impossible to install the system according to the plans or (2) B&L Electric simply performed the on-site installation improperly.   Tegeler's Report and Ingrid Green's deposition testimony provide conflicting evidence on this issue, indicating a genuine issue of material fact.  Similarly, although Ritz-Craft pointed out that the Geauga County Building Inspector approved the Model Home for occupancy, the testimony Ritz-Craft cites for this fact also indicates that the Building Inspector concluded that the electrical system would need repairs.  (I. Green Dep. 240.)  Accordingly, there is a genuine issue of material fact and summary judgment is <u>not</u> appropriate with respect to Ritz-Craft's Negligent Manufacturing claims in connection with the electrical system in the Model Home.

### ii.     The Greens' Negligent Design & Installation Claims Regarding the Staircase

Ritz-Craft's second Negligence claim relates to alleged defects in the design and installation

31

of the foyer staircase in the Model Home.  Specifically, Ritz-Craft contends that the Greens cannot

prove (1) that Ritz-Craft had a duty to <u>install</u> the staircase on-site; and (2) that Ritz-Craft's design

was defective in any way.

In support of these contentions, Ritz-Craft submits the Tegeler Report, in which Tegeler

states:

> The building was inspected at the time of manufacturing and was found to be in
> compliance with the approved plans and the 1999 Ohio Residential Code.  The lower
> section of the site installed handrail was found to be exceeding the max height of 38"
> as indicated in section 315.1 [of the 1999 Ohio Residential Code], the final
> installation was not the responsibility of Ritz-Craft.
>
> . . .
>
> The building was inspected at the time of manufacturing and was found to be in
> compliance with the approved plans and the 1999 Ohio Residential Code.  The stair
> riser height has been found to be compliant with 314.2 (maximum riser height 8 1/4"
> with a maximum variation of 3/8" per flight of stairs).  In addition to the stairs being
> code complian[t] the final installation of the stair was not the responsibility of Ritz-
> Craft.

(Tegeler Report at 3.)  In addition, Ritz-Craft argues that Dale Olson's expert report ("Olson

Report," Doc. 51-7),[25] submitted by the Greens, does not assert that the design of the foyer staircase

is defective; in fact, Ritz-Craft points out that Olson does not even say the staircase fails to meet the

applicable state standards.  (*Id*. at 24.)  Lastly, Ritz-Craft notes that the Geauga County Building

Department issued a certificate of occupancy.  (Reply Br. at 18.)

For their part, the Greens assert that Ritz-Craft delivered the foyer staircase in a non-

---

[25]  Again, Ritz-Craft notes that, because the "expert" who prepared the report did not
attach a *curriculum vitae*, it is impossible to determine whether he is actually qualified to act as
an expert. (Partial MSJ at 24 n.8.)  Ritz-Craft states that it will assume his status as an expert for
purposes of this motion only, reserving its right to challenge that designation in the future.  (*Id*.)

compliant condition.  In support of this argument, they point to the Olson Report, which, in pertinent part, states as follows:

> The oak handrail is positioned too high and the actual treads on the staircase vary in height.  This presents an inconsistent and unsafe condition.  In order to remedy the problem, the staircase must be removed and reconstructed.

(Olson Report.)  In addition, the Greens submit the affidavit of Ingrid Green, which explains that she personally measured the height of the handrails and stairway treads and found them to be non-compliant with the applicable state code.  (I. Green Aff. ¶¶ 7-11.)[26]  She further states that:

> The entire staircase (as well as the entire modular structure) of this residence was designed and constructed at the Ritz-Craft factory.  It was sent by Ritz-Craft with precut dimensions and it was not meant to be cut down or reconfigured when it was installed.

(*Id*. ¶ 10.)

First, with respect to the Greens' Negligent Installation claim, they have presented no evidence indicating that Ritz-Craft had a duty to install the foyer staircase on-site.  The Set Crew Agreement establishes that on-site assembly is <u>not</u> Ritz-Craft's responsibility, and the Greens have not provided the Court with evidence indicating that it should not govern this issue.  Therefore, there is no genuine issue of material fact with respect to the duty element of this negligence claim and Ritz-Craft is entitled to summary judgment.

---

[26]  Ritz-Craft argues that the Court should disregard Ingrid Green's affidavit because it is a self-serving statement designed to respond to Ritz-Craft's Partial MSJ.  (Reply Br. at 13, 17-18.)  This is certainly true; however, the affidavit presents facts within Ingrid Green's personal knowledge and relevant to the issues at hand.  In addition, the affidavit is consistent with Ingrid Green's deposition testimony.  Accordingly, the Court will consider the affidavit along with the other evidence the parties have submitted.

33

The evidence the Greens <u>have</u> submitted pertains to the design and construction of the staircase.  In particular, Ingrid Green's testimony that the <u>entire</u> staircase was designed and constructed at the Ritz-Craft factory suggests that Ritz-Craft delivered the staircase in its present condition and configuration.  In addition to the paragraph from her affidavit quoted above, Ingrid Green testified at her deposition as follows:

> [The staircase] came as a stairway that was already premade from the factory that we were to place in and it would fit perfectly, which – so they made the risers wrong on the one that they actually made and then we tried to make it work temporarily until someone could come out and rework it.
>
> Q.  At what point during the assembly . . . of this stairs . . . did you or your subcontractor notice a problem?
>
> A.  We did not assemble that stair.  That stair – when you say "assemble," to me that means it was made.  We did not make that stair.  We put it in.  And when I say "we," it was myself and Dale Olson and his employees.
> . . .
> Q. . . . . At what point did [Olson] tell you there was a problem [with the stair]?
>
> A.  At the point that he took the stairs out from the bedroom that they were stored in. It was one piece, okay?
>
> Q.  Okay.
>
> A.  And he went to put them in between the space of the landing and the second floor.  They did not fit.

(I. Green Dep. 152-55.)  This testimony further indicates that the staircase, as pre-assembled by Ritz-Craft, was the wrong size.[27]  Ingrid Green goes on to explain that Olson installed the staircase anyway because the alternative was to have no means of access to the second floor and a gaping hole

---

[27]    Ingrid Green goes on to explain that Olson installed the staircase anyway because the alternative was to have no means of access to the second floor and a gaping hole in the middle of the house.  (*Id*. 155.)

in the floor.  (*Id*. 155.)  Similarly, although Ingrid Green's testimony suggests that the handrail was a separate unit from the staircase, she also testified that Olson realized it was defective when he attempted to install it.  (*Id*. 210-11.)

Tegeler's statement in his report that the staircase was inspected and approved at the Ritz-Craft factory seems to conflict with Ingrid Green's testimony – presumably, an approved staircase in compliance with all applicable codes would fit the space allotted.  The fact that the staircase, which according to Ingrid Green was delivered as a separate component, passed inspection at the Ritz-Craft factory could indicate a design defect – *i.e.*, the staircase was not designed to match the other components of the house, but the inspection failed to recognize this.  Or, as discussed above in connection with the electrical system, this could indicate a failure to manufacture the staircase according to the design.  Ritz-Craft's theory – that the problems with the staircase are exclusively attributable to on-site installation – is also possible.  Construing the facts in the light most favorable to the Greens, however, there is a material issue of fact with respect to their design defect claim.

Accordingly, summary judgment is <u>not</u> appropriate with respect to the Greens' Negligent Design claim concerning the foyer staircase.

### iii.  The Greens' Other Negligent Design Claims

Lastly, Ritz-Craft briefly argues that the Court should grant summary judgment dismissing the Greens' <u>design</u> claims relating to numerous[28] other alleged defects with the Model Home.  Specifically, Ritz-Craft asserts that:

---

[28]  Ritz-Craft includes the electrical system and staircase in this list.  The Court has already addressed these problems above and need not repeat that analysis here.

There is simply no evidence of record that Ritz-Craft's *design* of the following items violated any applicable standard of care or that the design was the proximate cause of Plaintiffs' claims:

- Windows;
. . .
- Venting system;
- Bay window and roof;
- Plumbing and bath components;
- Sink and sink fixtures;
- Flooring;
- Carpeting;
- Cabinetry.

(Partial MSJ at 25-26 (emphasis in original).)

The Greens characterize Ritz-Craft's argument as a "shotgun attack" without reference to "supporting evidentiary material[.]" (Opp'n Br. at 20-21.)  The Greens also reiterate the argument that it is undisputed that Ritz-Craft sells a "systems built product" such that, "when one part of the system fails, then the entire system or product is damaged." (*Id*. at 21.)  In other words, the evidence of defects concerning some aspects or pre-fabricated components of the Model Home taints all aspects of the home, which must fit together like the pieces of a jigsaw puzzle.  The Greens then reference specific testimony or other evidence relating to each area identified by Ritz-Craft and listed above.  (*Id*. at 21-25.)

In several of these areas, the evidence the Greens reference does not in any way suggest that Ritz-Craft's underline design caused the problem.  For the reasons discussed above in the context of the electrical system, summary judgment is appropriate with respect to these areas.   In other areas, summary judgment is not appropriate because, for the reasons discussed above in the context of the staircase, there is a genuine issue of material fact with respect to causation – *i.e.*, whether Ritz-

36

Craft's design caused the problem after Ritz-Craft shipped the components to Ohio.

### a.  Windows

The Greens submit an excerpt from the Olson Report noting that the seals on certain windows are broken.  There is no connection between Olson's description of the problem with the windows and Ritz-Craft's design.  Accordingly, summary judgment dismissing this claim is appropriate.

### b.  Venting System

The Greens reference the Olson Report and testimony from Kenneth Green's deposition indicating discrepancies between the plan submitted to the state and the plan that accompanied delivery of the components.  (Opp'n Br. at 22.)  As discussed above in connection with the staircase, this is sufficient to create a genuine issue of material fact with respect to this particular negligent design claim.

### c.  Bay Window & Roof

The Greens submit that water damage has resulted from "poor workmanship by the Citadel set crew and improper cutting of engineered pieces by Ritz-Craft[.]" (Opp'n Br. at 22-23.)  Because this evidence relates to the installation or construction of the bay window and roof, as opposed to its design, summary judgment dismissing these claims is appropriate.

### d.  Plumbing & Bath Components

The Greens submit that open seams in the master bathroom are causing various forms of water damage to the surrounding area.  (*Id*. at 23.)  There is no connection between this evidence and Ritz-Craft's design of the product, as opposed to its manufacture or installation.  Therefore, summary judgment dismissing these claims is appropriate.

37

          e. **Sink & Sink Fixtures; Flooring; Carpeting; Cabinetry**

The Greens submit evidence indicating that Ritz-Craft failed to properly connect a dishwasher hose, causing extensive water damage to the walls, floor, and cabinets.  (*Id*.)  In addition, the Greens believe that the floor squeaks because Ritz-Craft did not properly glue it down, and the carpeting is delaminating.  (*Id*. at 24.)  Again, although this may be evidence of a manufacturing defect or a problem with the on-site installation, it does not evince a design defect.  Accordingly, summary judgment dismissing these claims is appropriate.

          c. **The Greens' Common Law Product Liability Claims**

Lastly, Ritz-Craft seeks summary judgment with respect to the Greens' common law Product Liability Claims.  Ritz-Craft first argues that the Greens cannot assert this claim because a pre-fabricated home is not a "product."[29]  Ritz-Craft raises a number of arguments; chief among them is the proposition that a pre-fabricated home is realty, and it is well-settled that realty is not a "product."  (Partial MSJ at 20-21.)

In response, the Greens argue that the components of pre-fabricated homes are not realty, but do not cite any authority for this proposition.

---

[29]  As noted above, Ritz-Craft incorrectly assumes that the Greens' Product Liability claim arises pursuant to the Ohio Product Liability Act.  The Greens expressly disclaim such a claim in their response brief, however, stating that their Product Liability claim is a common law claim.  (Opp'n Br. at 13.)  Although Ritz-Craft briefly argues that a statutory Product Liability claim is not appropriate for damages to the product itself under O.R.C. § 2307.71(G), the statute does not preempt common law Product Liability claims by a consumer for economic loss if the claim arose prior to April 7, 2005.  *See Carrel*, 677 N.E.2d at 800; *Luthman*, 2008 Ohio App. LEXIS 139 at ¶ 15 (finding that because the cause of action arose prior to the April 7, 2005 effective date, even though the complaint was filed on June 5, 2005, the amendment to R.C. 2307.71 did not apply).

In Ohio, it has long been the rule that, in distinguishing between "goods" and realty for purposes of the Uniform Commercial Code, the question is whether the item is "movable at the time of identification to the contract for sale." *See Fuqua Homes, Inc. v. Evanston Bldg. & Loan Co.*, 370 N.E.2d 780, 783 (Ohio App. Ct. 1977); *see also Keiber v. Spicer Constr. Co.*, 619 N.E.2d 1105, 1108 (Ohio App. Ct. 1993) (citing *Fuqua Homes*). Therefore, for purposes of the U.C.C., a mobile home or pre-fabricated home is classified as a "good" until it is fixed to land, at which point it becomes realty. *Id.* This distinction is well-established, and the reasoning behind it is apparent and sound. *See also Lantis v. Astec Indus., Inc.*, 648 F.2d 1118, 1121 (7th Cir. 1981) (holding that component parts of a building delivered unassembled were "products" for purposes of analyzing product liability claims); *Kaneko v. Hilo Coast Processing*, 654 P.2d 343, 350 (Haw. 1982) (finding that "a prefabricated building that must be assembled is a product where the seller-manufacturer may be found strictly liable for injuries caused by a defective component part"). Therefore, although this case does not implicate the sale of goods under the applicable version of the U.C.C., the Court finds that the same principles apply. Applying this rule, the components of a pre-fabricated home are movable at the time of the contract between the manufacturer (*i.e.*, Ritz-Craft) and the builder (*i.e.*, Flex Homes). Accordingly, the Court rejects Ritz-Craft's argument that it is not selling a "product."

Further, a non-commercial, consumer party who is not in privity with the manufacturer can assert a common law products liability claim, based upon implied warranty theory, to recover purely economic damages from a product supplier. *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996); *Norcold*, 798 N.E.2d at 627 (noting that the court in *LaPuma* "reaffirmed the existence of a noncommercial consumer plaintiff's common-law products liability claim, based upon implied warranty theory, to recover purely economic damages from a product supplier with whom the

39

plaintiff was not in privity").  A common law implied warranty claim consists of the following elements: "(1) there was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss."  *Thornton,* 2006 U.S. Dist. LEXIS 83968 at *34.

To the extent it alleges purely economic harm, the Greens' Product Liability claim falls into the category described in *LaPuma*.  They allege that "[t]he pre-manufactured house components manufactured and sold by Ritz-Craft pursuant to the Contract deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards." (Compl. ¶ 27.)  The evidence discussed above in the context of the negligence claims, moreover, addresses each element of the claim, and establishes genuine issues of material fact with respect to these allegations.  For example, there is at least a genuine issue of material fact with respect to whether the staircase was defective at the time it left the Ritz-Craft factory, and that this defect damaged the Model Home.  Therefore, the Greens may assert a common law products liability claim for economic harm, and Ritz-Craft is not entitled to summary judgment with respect to this claim.[30]

---

[30]  The Greens' Product Liability claim also asserts an entitlement to damages for emotional distress.  As noted above, the Greens have expressly disclaimed any statutory product liability claims.  Furthermore, common law product liability claims for physical injuries and emotional distress were pre-empted by the Ohio Product Liability Act because they fit within the statutory definition of a "product liability claim" at O.R.C. § 2307.71(M).  *See See Carrel*, 677 N.E.2d at 800; *LaPuma*, 661 N.E.2d at 716; *see also Chamberlain v. Am. Tobacco Co., Inc.*, 96-CV-2005, 1999 WL 33994451, at *4 (N.D. Ohio Nov. 19, 1999).  Accordingly, the Greens cannot recover damages for emotional distress pursuant to their common law product liability claim, and that aspect of the claim is **DISMISSED**.

III.    **CONCLUSION**

*Defendants Ritz-Craft Corp of Michigan, Inc. and Ritz-Craft Corp of PA, Inc's Motion for*

*Partial Summary Judgment* (Doc. 51) is **GRANTED in part and DENIED in part**.  The motion

is **GRANTED** with respect to the following claims, all of which are hereby **DISMISSED**:

      Count I, Breach of Contract, as alleged by Flex Homes;
      Count V, Products Liability, as alleged by Flex Homes;
      Count V, Products Liability, to the extent alleged for recovery of damages for emotional
      distress.
      Count VI, Ohio Consumer Sales Practices Act, as alleged by the Greens;
      Count IV, Negligence, certain aspects of the Greens' claims, as described above;

      Consequently, the following claims remain pending in this lawsuit:

      Count II, Breach of the Implied Warranty of Workmanship, asserted by the Greens;
      Count IV, Negligence, those aspects of the Greens' claims not dismissed by this Order;
      Count V, Products Liability, as alleged by the Greens for damages other than emotional
      distress.

      Further, Flex Homes and Ritz-Craft are **ORDERED TO SHOW CAUSE within ten (10)**

**days** why their claims against Citadel should not be dismissed for failure to prosecute, and Ritz-Craft

is **ORDERED TO SHOW CAUSE within ten (10) days** why its claims against B&L Electric

should not be dismissed for failure to prosecute.

      Lastly, a status conference is scheduled for **November 4,  2009** at **1:00 p.m.** in chambers to

discuss the status of this case and establish a new case schedule, including a trial date.


**IT IS SO ORDERED.**

                          s/Kathleen M. O'Malley
                          **KATHLEEN McDONALD O'MALLEY**
                          **UNITED STATES DISTRICT JUDGE**

**Dated: September 30, 2009**